**AMALGAMATED CLOTHING WORK-
ERS OF AMERICA, AFL–CIO,
Plaintiff-Appellant,**

v.

**IRONALL FACTORIES CO., Inc.,
Defendant-Appellee.**

No. 17321.

United States Court of Appeals
Sixth Circuit.

Dec. 9, 1967.

Stewart R. Jaffy, Columbus, Ohio (David Clayman, Stewart R. Jaffy, Clay-man, Sigall, Jaffy & Taylor, Columbus, Ohio, Jacob Sheinkman, Robert D. Lippmann, New York City, on the brief), for appellant.

S. Arthur Spiegel, Cincinnati, Ohio (Cohen, Baron, Todd & Hogan, Philip A. Cohen, S. Arthur Spiegel, Cincinnati, Ohio, on the brief), for appellee.

Before WEICK, Chief Judge, EDWARDS, Circuit Judge, and CECIL, Senior Circuit Judge.

CECIL, Senior Circuit Judge.

This is an appeal from an order of the United States District Court for the Southern District of Ohio, Western Division, granting summary judgment in favor of defendant-appellee in plaintiff's action to require arbitration of certain alleged grievances. Jurisdiction below was based upon Section 301 of the Labor Management Relations Act. (Section 185, Title 29, U.S.C.) We have jurisdiction by virtue of Section 1291, Title 28, U.S.C.

The defendant-appellee, Ironall Factories Co., Inc., hereafter referred to as Ironall, has its principal place of business in Cincinnati, Ohio, and until September, 1962, maintained a production facility at Lawrenceberg, Tennessee. The production and maintenance employees at the Lawrenceberg plant were represented by the Amalgamated Clothing Workers of America, AFL–CIO, hereafter referred to as the union. In 1960 Ironall and the union entered into a collective bargaining agreement, which, with a modification to be hereafter discussed, was extended until April 4, 1963.

Article IV, the provision in the collective bargaining agreement concerning wage rates, provided that wage rates for new or changed operations were to be fixed by mutual agreement between Ironall and the union and would maintain the section employees' average hourly earnings. The agreement also had a broad arbitration clause providing that "any complaint, grievance or dispute arising out of or relating to provisions of this Agreement, or the interpretation * *

thereof * * * shall be referred for arbitration and determination. * * "

In 1961 Ironall decided to inaugurate a new program in the sewing room in order to increase its operational efficiency. A supplemental agreement with the union, dated April 4, 1961, stated that the first phase of the new program would commence following consultation with the union relative to procedures. It also provided that if Ironall, on or about April 4, 1962, decided to proceed with the second phase of the program, Ironall would make a specified contribution to insurance funds on behalf of its employees. In a letter agreement of August 9, 1961, it was agreed that:

"2) When the new piece rate for the operation is set after the instruction phase, the employees will work on the new piece rate with fair and reasonable effort for a period of four weeks. At the end of the four-week period if the section is maintaining 85 to 90% of the previous sections earnings, the people on this job shall continue to work on the piece rate for an additional four weeks. If the section is not maintaining the aforementioned level of earnings, the union at this time will take up the rate on a grievance.

"3) At the end of the period of eight weeks a changed section should have at least reached the prior level of section earnings. If they are not achieving this level, the union will at this point take up the rate."

Late in 1961, Ironall instituted the new program in the sewing room. On or about April 4, 1962, Ironall determined that the first phase of the program was unsuccessful and did not proceed with the second phase. The union had not yet complained or filed a grievance concerning Ironall's failure to maintain the average hourly wages of the sewing room employees. Following Ironall's announcement that it would not proceed with the second phase of the engineering program, the employees, in violation of a no-strike clause in the collective bargaining agreement, engaged in an unauthorized wildcat strike against Ironall. The strike was settled by a Memorandum of Agreement between the parties, dated April 19, 1962, which provided, *inter alia*, that Ironall would make the insurance payments which under the Supplemental Agreement of April 4, 1961, were to be made only if the second phase of the program was instituted. Another document labeled "Agreement on specific problems," also dated April 19, 1962, dealt with settlements of grievances of specified individuals. None of these agreements made mention of Ironall's alleged failure to maintain employees' average hourly wages.

Thereafter, during the summer of 1962, Ironall entered into negotiations for the sale of its business. The union was consulted in an effort to protect the interests of the employees. Ironall ceased operations on September 6, 1962, and turned over its assets to the purchaser on September 20, 1962. Thereafter Ironall did not engage in any manufacturing activity but merely maintained a Cincinnati mailing address. On January 24, 1963, Ironall formally notified the union, in writing, of its intention to terminate the collective bargaining agreement with the union. The union responded on March 1, 1963, stating that "there is one outstanding matter which arose at the time of the engineering program, that being the amount of back pay due to sewing room operators, *when they were in the learning phases of the Bertrand Frank Program.*" There appears to have been no further communication between the parties, until April 9, 1964, when the union wrote Ironall and restated its position that Ironall owed sewing room employees "back pay * * * as a result of the engineering program administered by Bertrand Frank Associates." On July 10, 1964, the union again wrote Ironall stating its intention to turn the matter over to its Legal Department. The attorney for the union wrote Ironall on July 20, 1964, requesting arbitration of grievances for alleged violations of Article IV(b) of the agreement in that "on or about January 1, 1962, a dispute arose as to wages due and owing the employees." Ironall denied any lia-

bility to arbitrate, and the union instituted the present action in the District Court to compel arbitration. The complaint states that:

"7. In January, 1962 a dispute occurred between plaintiff and defendant under the said Article IV (relating to wages) of the Collective Bargaining Agreement when the company introduced a new method of production resulting in a claim by the plaintiff that paragraph C thereof had not been complied with."

Paragraph C of the collective bargaining agreement relates to the maintenance of an employee's average hourly earnings upon commencement of a new or changed operation. Both parties moved for summary judgment. Among Ironall's defenses was the claim that the agreements of April 19, 1962, settled all disputes and grievances arising prior to that date. In its memorandum in support of its motion, the union made the following statement:

"The instant back pay dispute involves the amount of money owing to Sewing Room operators under the second phase of the Bertrand Frank Associates Program. The second phase of the Bertrand Frank Associates Program was not to begin until on or about April 14, 1962 (Ex. C attached to Mr. Sydney's affidavit). The instant dispute occurred in the summer of 1962 as the union was trying to let the Company have some time to work out the problems of the second phase of the program. (Ex. B., p. 2, attached to Mr. Sydney's affidavit.)

"Because the dispute did not even occur until the summer of 1962 it could not possibly have been resolved by an agreement signed in April, 1962."

This statement is erroneous and contrary to the allegations made in the complaint in that the alleged dispute actually arose in January, 1962, during the first phase of the new program. Ironall filed an affidavit of its president, Isidore Berman, in which he stated:

"7. That on or about April 4, 1962, the company, in accordance with the

discretion given it in the Supplemental Agreement of April 4, 1961, (Exhibit B of Leonard Sydney's affidavit) determined that the first phase of the Sewing Room Program had not been successful and decided not to proceed with the second phase of same, and that at no time prior or subsequent thereto was the second phase commenced by the company."

The union did not offer any affidavits at this time to contradict Mr. Berman's statement. It is presently undisputed that Ironall never instituted the second phase of the new program.

The District Court, in granting summary judgment in favor of Ironall, considered as critical the question of whether the second phase of the program was ever begun. The Court found that the papers and affidavits filed by the union did not question the fact that Ironall never instituted the second phase of the program. The court held that inasmuch as the union claimed that the grievance arose at a time when it is undisputed that it could not have arisen, the union had no cause of action. In addition the Court held that,

"Even if plaintiff had standing to pursue this action, which has already hereinabove been negatively resolved, it is determined that plaintiff has lost such standing through its laches in the presentation of its demand for arbitration."

The union, upon realizing the error committed in its memorandum, filed a motion for reconsideration. This motion was denied by the District Court which, assuming arguendo that an error had been made, stated that the alleged dispute would have been settled by the agreements of April 19, 1962, since the dispute would have arisen prior to that date, during the first phase of the program. The court found no reason to reconsider the question of laches. From these orders, the union appeals.

Inasmuch as the District Court, in denying the union's motion for reconsideration, disregarded the erroneous factual statements previously submitted

by the union, we do not feel it necessary to consider the correctness of the District Judge's first order, either as to his factual conclusions or the basis on which he made his ruling. We now proceed to discuss the validity of the District Judge's second order in which he found that there was no proper issue to be submitted to arbitration and in which he reaffirmed his prior holding that the union was barred by laches from enforcing any claim it might have had.

There is a strong national policy favoring the arbitration of labor disputes. United Steelworkers v. American Manufacturing Co., 363 U.S. 564, 80 S. Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers v. Enterprise Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424; United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed. 2d 1409; Rhine v. Union Carbide Corp., 343 F.2d 12, (C.A.6). If a doubt exists about the arbitrability of a dispute, that doubt should be resolved in favor of arbitration. United Steelworkers v. Warrior & Gulf Nav. Co., supra; General Teamsters, Chauffeurs & Helpers U. v. Blue Cab Co., 353 F.2d 687, (C.A. 7); Local Union No. 24, Int. Bro. of Elec. Wkrs. v. Hearst Corp., 352 F.2d 957, (C.A.4), cert. den. 383 U.S. 937, 86 S.Ct. 1067, 15 L.Ed.2d 853. A court, by ordering arbitration, does not pass upon the merits of the dispute, but merely holds that the dispute is a proper subject for arbitration. United Steelworkers v. American Manufacturing Co., supra; Rhine v. Union Carbide Corp., supra.

Arbitration is a matter of contract and, in spite of the strong policy in its favor, a party cannot be compelled to arbitrate that which it has not agreed to arbitrate. John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898; Association of Industrial Scientists v. Shell Development Co., 348 F.2d 385, (C.A.9); Strauss v. Silvercup Bakers, Inc., 353 F.2d 555, (C.A. 2). In this case the collective bargaining agreement provides that the new rates "shall maintain the section's aver-age hourly earnings." Upon renewal of the agreement it was additionally provided that Ironall could, after consultation with the union, inaugurate a new operational program to increase efficiency. It was further agreed by letter that, if following a trial period the employees did not maintain their average hourly earnings, "the union will at this point take up the rate" as a grievance. The crux of the union's complaint is that Ironall failed to maintain the average hourly earnings of sewing room employees following the introduction of the new program as required by their collective bargaining agreement. Ironall claims, and the union denied, that the agreements of April 19, 1962, though settling the unauthorized strike of employees, also settled the dispute which the union wishes submitted to arbitration. Ironall contends that the agreements resolved any and all disputes arising prior to that date, including the one under consideration herein. The union denies that claim, and asserts that the agreements were limited to the issues specifically mentioned therein and did not resolve the present disputed issue. The agreements of April 19, 1962, do not specifically mention the union's claim that Ironall owes sewing room employees back pay for failure to maintain their average hourly earnings. This is a classic example of a dispute concerning the correct interpretation to be accorded to the collective bargaining agreements between union and management. The arbitration clause in the contract specifically states that "any complaint * * * or dispute arising out of or relating to provisions of this Agreement, or *the interpretation* * * * thereof * * * shall be referred for arbitration * * *." (Emphasis added.)

The function of the court in a proceeding under Section 301 of the Labor Management Relations Act (29 U.S.C. § 185) is limited to determining whether the subject matter of the dispute is one which the parties have agreed to submit to arbitration. United Steelworkers v. American Manufacturing Co., supra; Atkinson v. Sinclair Refining Co.,

370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462; John Wiley & Sons, Inc. v. Livingston, supra. The Court "is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." United Steelworkers v. American Manufacturing Co., supra, 363 U.S. at p. 568, 80 S.Ct. at p. 1346. We hold that the question of whether the agreements of April 9, 1962 settled the alleged dispute involved herein, was a matter for the arbitrator, not the court, to determine.

■ The general rule, as stated above, is that the court's function in a suit to compel arbitration is terminated once it decides that the substantive issue involved is a proper subject for arbitration. Once it makes this determination, " 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." John Wiley & Sons, Inc. v. Livingston, supra, 376 U.S. at p. 557, 84 S.Ct. at p. 918; Rhine v. Union Carbide Corp., supra; American Radiator & Stand. San. Corp. v. Local 7 of Int. Bro., 358 F.2d 455, (C.A.6). Procedural questions usually involve claims by one of the parties that the other party has failed to follow the procedural conditions specified in the collective bargaining agreement. The disposition of such a claim really involves a matter of contract interpretation. The arbitrator, being the person selected to interpret the contract, must answer the question of whether a party has forfeited his right to secure arbitration by failure to follow procedures detailed in the collective bargaining agreement. The answer to this question must depend on an interpretation of the contract. Avco Corp., Electronics & Ordnance Div. v. Mitchell, 336 F.2d 289 (C.A.6).

The Supreme Court said in Wiley, supra, 376 U.S. at pp. 556–557, 84 S.Ct. at p. 918:

"Questions concerning the procedural prerequisites to arbitration do not arise in a vacuum; they develop in the context of an actual dispute about the rights of the parties to the contract or those covered by it."

Regarding "procedural disagreements not as separate disputes but as aspects of the dispute which called the grievance procedures into play," such disagreements must be submitted to arbitration. John Wiley & Sons v. Livingston, supra, p. 559, 84 S.Ct. p. 919. The question before us is whether in a suit to compel arbitration, laches is an equitable defense to be determined by the court or a procedural question to be determined by the arbitrator.

This Court has said:

"The test of arbitrability on procedural questions, where the parties are obligated to submit the subject matter of a dispute to arbitration, is whether the procedural questions grow out of the dispute and bear on its final disposition." Western Auto M. Screw Co. v. International U., U.A., A.&A. I.W., 335 F.2d 103, 106 (C.A.6).

The Fifth Circuit has by negative implication stated that laches may be a defense where the elements of delay and harm exist between the demand for arbitration and a suit to compel arbitration following a refusal or failure to arbitrate. International Ass'n of Machinists v. Hayes Corporation, 296 F.2d 238. See Reconstruction Finance Corp. v. Harrisons & Crossfield, 204 F.2d 366, 369, 37 A.L.R.2d 1117 (C.A.2), where, in an action to enjoin the defendant from arbitrating a claim, the court held that laches is an equitable defense to be determined by the court; and World Brilliance Corp. v. Bethlehem Steel Co., 342 F.2d 362, 365 (C.A.2), where the court held in an action to compel arbitration that laches is "an issue traditionally decided by a judge, sitting in equity without a jury."

■ In deciding whether the union, in this case, is barred from prosecuting its cause of action because of its laches, we are not indulging in the judicially unwarranted task of interpreting the collective bargaining agreement. Laches is independent of any procedure established by the collective bargaining agreement

and a decision on laches adds or subtracts nothing from the meaning of the agreement. Furthermore, consideration of the issue in no way involves a consideration of the merits of the underlying substantive issue. The question which the District Court considered was whether the union's delay in requesting arbitration prejudiced Ironall's rights and defense in this matter. Such question does not involve any matter of contract interpretation and does not bear on the disposition of the underlying dispute, and hence was a proper subject for court consideration.

The undisputed facts in the case indicate that the alleged dispute over maintenance of average hourly earnings arose in January, 1962. Ironall, in communication with the union, sold the assets of the plant in September, 1962, after which it existed in name only. The union first gave notice of the existence of a dispute over back pay owed sewing room operators in March, 1963. This was more than one year after the dispute arose, and some six months after Ironall disposed of its property. And it was not until July, 1964, that the union formally requested that the matter be submitted to arbitration. The union states that it delayed in processing the grievance involved herein because there was no appropriate period to judge whether Ironall was complying with the maintenance of earnings provisions in the collective bargaining agreement. However, it waited until six months after the plant was sold before giving Ironall notice of the dispute and an additional sixteen months before formally requesting arbitration. Such an unwarranted delay is detrimental to Ironall, who now exists in name alone. Failure to give notice and request arbitration until such a late date would present serious impediments to Ironall in making an effective defense.

In view of these considerations, the District Court was correct in barring the union's cause of action due to the union's laches in presenting it.

The judgment of the District Court is affirmed.