**TOBACCO WORKERS INTERNATIONAL UNION, LOCAL 317, Appellant,**

v.

**LORILLARD CORPORATION, Appellee.**

**Nos. 15343, 15344.**

United States Court of Appeals, Fourth Circuit.

Argued May 3, 1971.

Decided Sept. 16, 1971.

Larry Thomas Black, Charlotte, N. C. (Robert G. Sanders, Charlotte, N. C., and James F. Carroll, Washington, D. C., on brief), for appellant.

Thornton H. Brooks, Greensboro, N. C. (C. Allen Foster and McLendon, Brim, Brooks, Pierce & Daniels, Greensboro, N. C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and CRAVEN and RUSSELL, Circuit Judges.

CRAVEN, Circuit Judge:

Tobacco Workers International Union, AFL–CIO, Local 317 (hereinafter the Union) brought this action pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, against the Lorillard Corporation (hereinafter the Company) in the District Court for the Middle District of North Carolina for specific performance of a collective bargaining agreement clause providing for arbitration of employee grievances. The District Court ordered arbitration of some of the grievances and refused to order arbitration of the rest.[1] Both the Company and the Union appeal from the portions of the District Court judgment adverse to them. We conclude that all the grievances are arbitrable, and affirm in part and reverse in part.

The collective bargaining agreement which applies to this suit was entered into by the Union and the Company on March 1, 1965, and was in effect from that date to March 1, 1968. The agreement provides a grievance procedure which can be instituted by any employee who believes "he or she has been unjustly dealt with."[2] Grievances which involve either disciplinary action claimed to have been imposed without just cause or application of the agreement's seniority provisions with respect to promotions, layoffs, and recalls may be submitted to arbitration at the request of the Union.[3] The contract provides for departmental seniority. When a job vacancy occurs within a department, employees within the department who wish to fill the opening bid for it. The employee with the greatest seniority is given the job, provided that he or she is qualified to do the work.[4] Like promotions, layoffs and recalls are made on a departmental basis. Employees are laid off in the inverse order of their seniority provided that the senior employees retained have the ability to do the work remaining in the department during the layoff. Recalls are made in the reverse order in which the employees are laid off.[5]

The bargaining agreement which was in effect prior to the March 1, 1965 agreement contained separate pay scales and separate job classifications for male and female employees. Apparently in response to the Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000e to 2000e–15, the denomination of jobs as either male jobs or female jobs was eliminated from and a non-discrimina-

---

1. The opinion of the District Court is reported as Tobacco Workers Local 317 v. P. Lorillard Corp., 314 F.Supp. 513 (M.D. N.C.1970).

2. See Article 22, Section 1, of the agreement set out in the Appendix, *infra*.

3. See Article 23 of the agreement set out in the Appendix, *infra*.

4. See Article 14, Section 3, of the agreement set out in the Appendix, *infra*.

5. See Article 14, Sections 4 and 5, of the agreement set out in the Appendix, *infra*.

tion clause [6] was added to the March 1, 1965 agreement. In spite of the change in contract language, the Company continued to consider only male employees for jobs reserved for males under the previous contract and only female employees for jobs previously reserved for females. Each of the seven grievances which make up the subject matter of this action claim that the Company's continuation of this policy denied them the right to do certain kinds of work being performed by employees with less seniority in violation of the agreement's seniority provisions regarding promotions, layoffs and recalls.

Four of the grievances were filed late in 1965. The first two, filed by Betty Mae Greenwale and Ruby A. Fields (hereinafter Fields I), claimed that the female grievants had bid on job vacancies that arose in their department, that they had greater seniority than the employee who was awarded the job, and that they were not considered for the vacancies because the jobs were limited to male employees. The next two grievances, filed by Ruby Stanley and James M. Talley, were filed in response to the Company's announcement of an impending layoff. Both grievances claimed that the grievants should not be included in the layoff because employees with less seniority who were performing jobs traditionally limited to employees of the opposite sex were not included in the layoff. The grievance filed by Ruby Stanley was signed by five additional female employees in the same department, Barbara Vaden, Fleeta Mae Ayers, Katherine Fuller, Jean A. Way and Della K. Hunter. The Company contends this was a single grievance of Ruby Stanley. The Union contends it was a multiple grievance.

The Company refused to grant the relief requested by each of the grievants and, at first, refused to submit any of the grievances to arbitration. Subsequently, however, the Company agreed to submit the Greenwale grievance to ar-

bitration. On July 15, 1966, the arbitrator issued an opinion and award which determined that the subject matter of the grievance was within the agreement's arbitration clause and that the agreement required job vacancies to be filled on the basis of the seniority of the qualified employees bidding for it without regard to sex. The matter was remanded back to the parties to determine whether Betty Mae Greenwale had the necessary qualifications to do the job she had bid for.

After the arbitrator's decision, the Company decided to give Betty Mae Greenwale the job she had bid for. During the period of time that the Greenwale grievance was being arbitrated, a number of the Company's employees were on layoff. Apparently as a result of a need for an increase in work force that arose at about the same time as the arbitrator's decision, the Company recalled the employees who had been laid off on August 1, 1966. Concurrent with the recall, those employees who had filed grievances earlier were given the jobs, formerly reserved to employees of the opposite sex, that they had asked for.

Upon being recalled to work, a number of the female employees inquired as to whether they would be given retroactive pay for the period during which they had either been laid off or denied requested promotions. The Company responded in the negative. This prompted the filing of three more grievances. Ruby A. Fields filed a second grievance (hereinafter Fields II) referencing her earlier one and requesting retroactive pay. Jean A. Way filed a grievance as a representative of "the girls of the packing department" claiming their layoff was unjust and requesting back pay. Evelyn Gaines filed a similar grievance representing "the [women] of the making department." The Company refused the Union's request to consider these grievances on the ground that they were not filed within the time limits specified in the agreement.

6. See Article 14 of the agreement set out in the Appendix, *infra*.

The Company raises four reasons why they should not be compelled to arbitrate the grievances:

(1) the Union failed to process some of the grievances within the time limits specified in the contract (Talley, Fields II, Way, and Gaines);

(2) a number of the grievances were satisfactorily adjusted when the Company granted the grievants the jobs they had requested (Greenwale, Fields I, and Stanley);

(3) the Fields II grievance is not arbitrable because the contract does not specifically provide for retroactive pay where an employee is denied a requested promotion and the arbitrator is not allowed to "impose * * * [an] obligation not explicity [sic] provided for in [the] Agreement."

(4) the entire action is barred by the Union's laches.

The District Court held that the issues of laches and procedural timeliness were questions for the arbitrator to decide and not for the courts; that the Greenwale, Fields I, and Stanley grievances were satisfactorily adjusted by awarding the grievants the position they requested;[7] that the Fields II grievance was not arbitrable because the contract provided for back pay only in cases of unjust layoff and recall and not in cases of refusal to promote; and that the contract requires that grievances be filed individually by each aggrieved employee and does not allow representative grievances. The net result was that the District Court directed arbitration of the Talley, Way and Gaines individual grievances and refused to compel arbitration of the others including the Way and Gaines grievances insofar as they attempted to grieve for employees other than themselves.

I. Procedural Questions

We think the District Court was clearly correct in deciding that the question of whether the grievances were timely filed was for the arbitrator. The Supreme Court resolved a split of authority that had existed among the circuits in John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), concluding that procedural questions are for the arbitrator. Part of the rationale for this result was that in many cases the merits of the dispute and the question of grievance procedure will be intertwined "raising the same questions on the same facts." The Company urges upon us the negative inference of this rationale, i. e., where the merits and the procedural questions are not so intertwined; the procedural questions should be decided by the courts and not the arbitrator.

We do not think the "intertwining" reason advanced in *John Wiley* can be elevated to the negative principle urged upon us by the Company. The difficulty of separating procedural and substantive questions was not the only reason for the Supreme Court's conclusion that procedural questions should be decided by the arbitrator. The Court was also concerned about "the opportunities for deliberate delay and the possibility of well-intentioned, but no less serious delay created by separation of the 'procedural' and 'substantive' [issues]." 376 U.S. at 558, 84 S.Ct. at 919.[8] The various circuits have invariably applied the *John Wiley* rule, without discussion of whether the procedural and substantive questions were independent of each other, in cases where the procedural questions were not, in fact, intertwined with the merits. *See* Trailways of New England, Inc. v. Amalgamated Ass'n, etc., Motor Coach Employees Division 1318, 343 F.

---

7. The Union does not appeal from the District Court's decision that the Greenwale and Fields I grievances are not subject to arbitration. The correctness of the District Court's decision that these grievances have been "satisfactorily adjusted" is therefore not before us.

8. The potential for delay is apparent from this case. The complaint was filed on May 15, 1967. The final judgment of the District Court was filed on August 10, 1970, more than three years later, and we heard argument on May 3, 1971.

2d 815, 818 (1st Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 164, 15 L.Ed.2d 120 (1965); Carey v. General Electric, 315 F.2d 499 (2d Cir. 1963); cert. denied, 377 U.S. 908, 84 S.Ct. 1162, 12 L.Ed.2d 179 (1964); Local Lodge No. 595 of District No. 152, Intern. Ass'n of Machinists v. Howe Sound Co., 350 F.2d 508 (3d Cir. 1965); Bealmer v. Texaco, Inc., 427 F.2d 885 (9th Cir.), cert. denied, 400 U.S. 926, 91 S.Ct. 187, 27 L. Ed.2d 185 (1970); Amalgamated Meat Cutters, etc., Local 405 v. Tennessee Dressed Beef Co., 428 F.2d 797 (6th Cir. 1970); Yellow Cab Co. v. Democratic Union Organizing Committee Local 777, 398 F.2d 735 (7th Cir. 1968), cert. denied, 393 U.S. 1015, 89 S.Ct. 619, 21 L. Ed.2d 561 (1969); Local 198, United Rubber, etc., Workers v. Interco, Inc., 415 F.2d 1208 (8th Cir. 1969); Local Union No. 490, United Rubber, etc., Workers v. Kirkhill Rubber Co., 367 F.2d 956 (9th Cir. 1966); International Union, UAW v. Folding Carrier Co., 422 F. 2d 47 (10th Cir. 1970). Where the argument the Company makes here has been raised, it has been rejected. Rochester Telephone Corp. v. Communication Workers, 340 F.2d 237 (2d Cir. 1965); cf. Association of Industrial Scientists v. Shell Development Co., 348 F.2d 385 (9th Cir. 1965).

■ We think, additionally, that the District Court's determination that the Way and Gaines grievances were arbitrable only as individual grievances and not as the grievances of a group of employees and that the Stanley grievance was not arbitrable because it was satisfactorily adjusted was error. Whether a group of employees who have an identical complaint must each file separate grievances or whether they can instead, in the interest of administrative convenience, choose a representative to file a single grievance for the entire group is clearly a question of grievance procedure which arises as a collateral issue to the substantive claim in the grievance and as such is a question to be decided by an arbitrator. John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).[9]

■ The District Court concluded that the Stanley grievance was satisfactorily adjusted because grievants were awarded the positions they sought and the written grievance contains no demand for retroactive pay. Although this conclusion does not appear on its face to be one involving a question of grievance procedure, there are two unstated premises that underlie the conclusion: (1) that a grievant must state explicitly all forms of appropriate relief for the Company's alleged breach of the agreement; (2) that the question of whether the agreement requires specific delineation of the remedies is one to be decided by the court and not the arbitrator. The first premise involves a matter of grievance procedure, i. e., how detailed must the written grievance be, and therefore the second premise is erroneous.[10]

9. Compare the cases holding that the question of whether multiple grievances should be submitted to a single arbitrator or multiple arbitrators is for the arbitrator to decide. Avon Prods., Inc. v. International Union, UAW, Local 710, 386 F.2d 651 (8th Cir. 1967); Fitchburg Paper Co. v. MacDonald, 242 F.Supp. 502 (D. Mass.1965); Local 469, International Broth. of Teamsters v. Hess Oil & Chem. Corp., 226 F.Supp. 452 (D.N.J.1964).

10. The Company argues that the District Court should be affirmed on this point because the Stanley grievance is frivolous and that the Talley grievance should receive the same treatment. The Supreme Court has expressly rejected the notion that a federal court could refuse to compel arbitration because it felt the claim to be frivolous. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). "[N]o matter how frivolous the merits of the grievance, [if] it is within the grievance and arbitration provisions, it must be processed through them." International Ass'n of Machinists Lodge 1652 v. International Aircraft Services, Inc., 302 F.2d 808, 815 (4th Cir. 1962). See also F & M Schaefer Brewing Co. v. Local 49, International Union of Brewery Workers, etc., 420 F.2d 854 (2d Cir. 1970); Galveston Maritime Ass'n v. South Atlantic.

## II. Remedies

■ The District Court refused to compel arbitration of the Fields II grievance because the contract did not specifically provide for retroactive pay in the case of unjust layoffs. The District Court based its conclusion on the sentence in Article 23 which states "The arbitrator shall have no authority to add to or subtract from, or in any way alter or modify any of the terms of this Agreement, or to impose on any party hereto a limitation or obligation not explicity [sic] provided for in this Agreement." This we think was error.

The quoted sentence does not, we think, limit the arbitrator's "jurisdiction" over those grievances which are subject to arbitration. It is not a limitation on arbitrability, but is instead merely a limitation on the arbitrator's power to fashion an award. Carey v. General Electric Co., 315 F.2d 499 (2d Cir. 1963), cert. denied, 377 U.S. 908, 84 S.Ct. 1162, 12 L.Ed.2d 179 (1964). As such it is inappropriate for a court to decide that such a clause excludes the remedy sought prior to arbitration. It is best to leave this question to the arbitrator initially in order to receive "the benefit of the arbitrator's interpretive skills as to * * his contractual authority." Torrington Co. v. Metal Products Workers Union Local 1645, 362 F.2d 677, 680 n. 6 (2d Cir. 1966).

■ Even if we interpret the quoted sentence as a limitation on arbitrability, we do not think it excludes the Fields II grievance. The Company argues that retroactive pay for unjustly denying an employee a promotion is an "obligation not explicit [sic] provided for in this Agreement." But the agreement contains no provision for any kind of remedy in cases involving promotions. Carried to its logical conclusion, the Company's argument would mean that an arbitrator would have jurisdiction to determine that the Company had violated the seniority provisions with respect to promotions, but would have no authority to direct the Company to correct its violation.[11] Arbitration would thus be rendered meaningless. Yellow Cab Co. v. Democratic Union Organizing Committee Local 777, 398 F.2d 735 (7th Cir. 1968), cert. denied, 393 U.S. 1015, 89 S.Ct. 619, 21 L.Ed.2d 561 (1969).[12]

etc. Longshoremen's Ass'n, 234 F.Supp. 250 (S.D.Tex.1964) ; Cox, Reflections Upon Labor Arbitration, 72 Harv.L.Rev. 1482, 1513–15 (1959).

The closest any court has come to stating that the court may refuse to compel arbitration if the grievance is without merit is the recognition of the possibility that a grievant's claim may be so totally devoid of merit as to amount to a "perversion of the grievance procedure." International Union of Elec., etc., v. General Electric Co., 407 F.2d 253, 259 n. 12 (2d Cir. 1968) ; Local 787, Local Union No. 787, Inter. Union of Elec., etc., Workers v. Collins Radio Co., 317 F.2d 214 (5th Cir. 1963). Even if we were to accept the notion that the District Court may examine the merits to such an extent, this case falls far short of such a test. The Stanley and Talley grievances were filed prior to the layoff. At the time they were filed, there was no question of back pay because the grievants were still working. They were seeking to prevent their being laid off ; and had they been successful, the question of back pay would never have arisen. The agreement speci-

fies that employees unfairly laid off will receive back pay. Article 22, Section 2, set out in the Appendix, *infra*. An arbitrator might well conclude that this section of the agreement automatically makes back pay one of the remedies for an unjust layoff whether it is claimed in the written grievance or not.

11. Recognizing this apparent dilemma, the Company argues to us that implicit in the seniority provisions of the agreement is "the commonplace remedy of awarding to the employee the job which was unjustly denied." The Company does not explain, however, why awarding the job sought is a commonplace remedy and awarding retroactive pay is not. Indeed, the Union took the position in the court below that it had been the Company's practice in the past to grant retroactive pay to employees who had been unjustly denied promotions.

12. "[Arbitrators] have quite uniformly held that the parties were not engaged in an academic exercise in seeking a ruling as to whether the contract had been violated, and that the power to decide the contract violation must carry with it the power

While a contract may contain provisions detailing what remedies should be applied to compensate for a particular breach, labor contracts, like other contracts, commonly do not.[13] Part of what the parties bargain for when they include an arbitration provision in a labor agreement is the "informed judgment" that the arbitrator can bring to bear on a grievance, especially as to the formulation of remedies. United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Therefore, we conclude that, although the agreement is silent as to remedies, the fashioning of an appropriate remedy is not an addition to the obligations imposed by the contract. In deciding that the agreement did not provide for retroactive pay in promotion cases, the District Court usurped the function of the arbitrator. See Lynchburg Foundry Co. v. United Steelworkers of America, Local 2556, 404 F.2d 259 (4th Cir. 1968); Lodge 12 etc., Machinists v. Cameron Iron Works, 292 F.2d 112 (5th Cir.), cert. denied, 368 U.S. 926, 82 S.Ct. 361, 7 L.Ed.2d 190 (1961).

### III. Laches

The most difficult question presented to us for review is the contention that the District Court erred in refusing to consider the Company's claim that the delay in filing some of the grievances and the delay in instituting this action after the Company refused to arbitrate constituted laches which should bar the Union's action for specific performance. The question is difficult because the two circuits that have squarely faced the question have both concluded that laches is an appropriate defense to a suit seeking to compel arbitration of a grievance arising out of a collective bargaining agreement where delay in presenting the grievance has prejudiced the defendant. International Union of Operating Engineers Local 150 v. Flair Builders, Inc., 440 F.2d 557 (7th Cir. 1971); Amalgamated Clothing Workers of America v. Ironall Factories Co., 386 F.2d 586 (6th Cir. 1967).[14] Both decisions are based on the same line of reasoning.

> The question before us is whether in a suit to compel arbitration, laches is an equitable defense to be determined by the court or a procedural question to be determined by the arbitrator.

> \* \* \* \* \* \*

> In deciding whether the union, in this case, is barred from prosecuting its cause of action because of its laches, we are not indulging in the judicially unwarranted task of interpreting the collective bargaining agreement. Laches is independent of any procedure established by the collective bargaining agreement and a decision on laches adds or subtracts nothing from the meaning of the agreement. Furthermore, consideration of the issue in no

to award a remedy." Fleming, Arbitrators and the Remedy Power, 48 Va.L.Rev. 1199, 1212 (1962).

13. "The conclusion that no money arbitration award is proper in the case of violations of contract provisions which do not specifically provide for damages would have two effects. The first would be the substitution of some other method of settlement in place of arbitration. The second would be the cluttering up of the contract with a lot of 'liquidated damage' provisions which would invite more trouble than they could ever be expected to prevent." International Harvester Co. v. Farm Equipment Workers Local 104, 9 Lab.Arb. 894,___(1947) (Wirtz, Arbitrator).

14. What other authority there is on this question consists of conflicting dictum, compare Deaton Truck Line v. Local Union 612, etc., Teamsters, 314 F.2d 418, 422 (5th Cir. 1962) with International Ass'n of Machinists v. Hayes Corp., 296 F.2d 238, 244 (5th Cir. 1961); a conclusion that questions of delay must be left to the arbitrator without any discussion of the question, International Union of Elect., etc., Workers v. Westinghouse Electric Co., 218 F.Supp. 82, 86 (S.D.N.Y. 1963), aff'd per curiam, 326 F.2d 758 (2d Cir. 1964); and a holding that laches was lacking while expressly disclaiming any decision on whether such a defense is appropriate, Local 198, Rubber, etc., Workers v. Interco, Inc., 415 F.2d 1208 (8th Cir. 1969).

way involves a consideration of the merits of the underlying substantive issue. The question which the district court considered was whether the Union's delay in requesting arbitration prejudiced [the Company's] rights and defense in this matter. Such question does not involve any matter of contract interpretation and does not bear on the disposition of the underlying dispute, and hence was a proper subject for court consideration.

Amalgamated Clothing Workers of America v. Ironall Factories Co., 386 F. 2d at 591–92. We think the reasoning of *Flair Builders* and *Ironall Factories* is contrary to the body of federal case law dealing with the enforcement of labor arbitration clauses in collective bargaining agreements that has developed since the decision in Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

 A federal judge deciding a case seeking enforcement of the arbitration clause of a collective bargaining agreement is faced with a delicate task. The duty to arbitrate is contractual and a party should not be compelled to arbitrate that which he has not agreed to arbitrate. United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed. 2d 1409 (1960). Thus the judge must determine whether there is an agreement to arbitrate and whether that agreement has been breached. But in deciding those questions that are necessarily his, he must take care to steer clear of the questions that the parties have agreed to settle through the arbitrator. If he does not, he becomes an instrument of a breach of the agreement.

██ In order to decide whether delay in presenting a grievance or seeking arbitration may appropriately raise the defense of laches in a suit to compel arbitration we must look to the function of laches as a defense to a suit in equity and to the goals of our national labor laws and the part that arbitration plays in achieving those goals. The primary purpose of our national labor laws is the avoidance of industrial strife. This goal is sought to be achieved by encouraging procedures for the resolution of disagreements without resort to strikes or lock-outs. Everyone loses in a strike.

The alternatives to strike and lock-out are litigation and arbitration. Arbitration is better for two reasons. First, the arbitrator can bring to the resolution of an industrial dispute an expertise and flexibility that most judges will not have. All contracts require interpretation, but labor contracts require more interpretation than others. They must be relatively short in order that their provisions can be generally known by large numbers of people, yet they must encompass all aspects of an extremely complex relationship. Labor agreements, therefore, require lots of gap filling. And the gaps must be filled in a manner suited to implement and smooth the production relationship. The traditional judicial rules of contract construction are too inflexible. "The generalities, the deliberate ambiguities, the gaps, the unforeseen contingencies, and the need for a rule even though the agreement is silent all require a creativeness in contract administration which is quite unlike the attitude of one construing a deed, a promissory note, or a 300-page corporate trust indenture." Cox, Reflections Upon Labor Arbitration, 72 Harv.L.Rev., 1482, 1493 (1959).[15]

---

15. *See also* Hepburn & Loiseaux, The Nature of the Arbitration Process, 10 Vand. L.Rev. 657, 659 (1957).

In litigation the parties to a labor agreement are compelled to fit their frequently unique questions into established legal doctrine. A suit for a breach of contract between labor and management must fit traditional patterns, parties must play their proper doctrinal parts and the court is limited in the type and scope of remedy which it can award. This economically and socially sensitive continuing relationship could not stand the strain if it were necessary to use our historical legal processes to solve every dispute.

Secondly, and perhaps even more importantly, litigation is too slow. Final judgment in a civil action involving factual issues takes an extended period of time, often measured in years. A grievance that remains unresolved over an extended period of time can become a festering sore that eventually leads to a breakdown of the production relationship by a strike. Arbitration, on the other hand, is designed to settle a grievance quickly.[16] For this reason, arbitration is not an alternative to litigation, but is instead an alternative to a strike.[17]

It is possible to view the entire trend of arbitrability decisions such as this as an attempt to limit judicial consideration to those issues that occasion little delay, i. e., those that can be resolved on a motion to dismiss on the pleadings and on the face of the written agreement without the requirement of an evidentiary hearing. Thus in A. S. Abell Co. v. Baltimore Typographical Union No. 12, 338 F.2d 190 (4th Cir. 1964), this court concluded that, where the union's claim that the parties did not agree to arbitrate a particular dispute (normally a question for the court) depended on proof of bargaining history (normally requiring an evidentiary hearing), resolution of the question must be left to the arbitrator. The opinion quoted with approval from International Union of Elec., etc., Workers v. General Electric Co., 332 F.2d 485, 490 (2d Cir. 1964): "[W]hile this bargaining history may prove very useful to an arbitrator * * * it is of no legitimate use to a court in deciding whether to order the company to submit the grievance to an arbitrator." *See also* Local Union 24, I.B.E.W. v. Wm. C. Bloom & Co., 242 F.Supp. 421 (D.Md. 1965).

 How then does the doctrine of laches fit within this industrial framework? In order for laches to bar a plaintiff's equitable relief, there must be: (1) an unexplained or inexcusable delay in asserting a known right which (2) causes injury or prejudice to the defendant. Not only does resolution of whether the delay in this case is excusable require a factual inquiry and thus the delay attendant to an evidentiary hearing, but it is precisely the same factual inquiry that the arbitrator must engage in to determine whether the Union's failure to comply with the procedural time limits of the contract should bar relief. Judicial resolution of this question is a wasteful duplication of effort. This aspect of a laches defense is "independent of any procedure established by the collective bargaining agreement" only as a matter of semantics. If we were to decide that this issue was appropriate for judicial resolution, the Company would have two chances for a favorable decision on the same issue. This is not only wasteful; it also seems unfair. Moreover, the arbitrator is in the best position to decide it.

 The question of prejudice to the Company from the Union's delay lends itself, too, to resolution by an arbitrator rather than by the court. There are two kinds of prejudice which might support a defense of laches: (1) the delay has resulted in the loss of the evidence which would support the defendant's position; or (2) the defendant has

---

16. "Arbitration offers speed, relative economy, and flexibility. Litigation is unsatisfactory to the parties because of great expense, undesired technicality and delay." Hepburn & Loiseaux, *supra* n. 15.

 This case took three years in the District Court from filing to final judgment. The Greenwale grievance, on the other hand, was decided within roughly three months after the parties agreed on an arbitrator.

17. In this case, arbitration is a contractual alternative to strike. See Article 24 of the agreement set out in the Appendix, *infra*. Even if the contract had not contained a no-strike clause, an identical limitation on the right to strike would be implied, Local 174, Teamsters, etc., of America v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), and be enforceable by injunction, Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

changed his position in a way that would not have occurred if the plaintiff had not delayed. The Company claims both kinds of prejudice. First, the Company asserts that had they known about the claims for retroactive pay prior to the layoffs, their potential $25,000 per month liability would have caused them to arbitrate immediately. Secondly, they assert that in order to determine whether any of the grievants were, in fact, entitled to the requested jobs, one must first determine whether the grievant was able to perform the work, and the best evidence of that ability would be the testimony of the grievant's supervisor, many of whom have since left the Company's employ.[18] But whether a grievant's ability can best be determined by the testimony of the grievant's former supervisor or by some other method, and whether it is reasonable to believe the Company's claim that they were not aware of the potential liability for back pay arising out of any of the layoffs requires a greater understanding of the industrial environment from which this case arose than we possess. Not all of the grievances involve the same kind of delay. This is the kind of a case where the arbitrator's creative ability to fashion remedies is especially needed.[19]

---

18. It is important to note here that the Company is claiming that evidence necessary to support its position on questions to be decided by the arbitrator is lost. If the Company was claiming instead that it had lost the evidence necessary to support its position on questions that are left for judicial decision, i. e., whether the grievance was in fact one which the parties agreed to arbitrate, we would have a different situation, and laches would, we think, be an appropriate judicial issue. The Second Circuit made precisely this distinction in a commercial arbitration case.

> We hold that on a motion to compel arbitration a district court may consider only claims of laches which relate to issues which the court must decide. The arbitrators must resolve any such claims which relate to issues which the parties have agreed to submit to arbitration.
> This conclusion is consistent with the policy of the Arbitration Act to eliminate the expense and delay of extended court proceedings preliminary to arbitration, * * * evils which would surely be promoted by a rule which made all questions of laches for the court, especially where a full hearing is required. * * * Moreover, in our view, laches is not a technical legal issue which only a judge is competent to decide. Rather, in the often esoteric field of commercial dealings, and in admiralty, it would seem that the severity of prejudice suffered through delay, and the reasonableness of excuses offered by the dilatory party, the elements of laches, might be resolved better where resort is had to the expertise of the arbitrators.

Trafalgar Shipping Co. v. International Milling Co., 401 F.2d 568, 572 (2d Cir. 1968). Although that case arose under the terms of the Federal Arbitration Act, we think its reasoning is equally applicable here. *Accord,* Halcon International, Inc. v. Monsanto Australia Limited, 446 F.2d 156 (7th Cir. 1971).

19. If, for example, the Company's hesitancy at assigning women to jobs formerly reserved to males is based on the physical strength requirements of the job rather than technical skill requirements, trying the grievant on the job to see if she could presently do the work might be a more reasonable means of testing her ability than searching the memory of her supervisor. In any event, before we could determine whether the Union's delay resulted in the disappearance of proof, we would have to know what kinds of evidence would be most relevant which would, in turn, require detailed knowledge about the requirements for each of the jobs sought, knowledge which we don't have. Also, the fact that a number of supervisors are no longer in the employ of the Company does not necessarily mean that they could not be located to testify.

The Company's contention that it would have acted differently had they been aware of their potential liability for back pay likewise raises questions that are particularly suited for determination by the arbitrator. The Stanley and Talley grievances were filed prior to the layoff and the agreement specifies that employees unfairly laid off will receive back pay. *See* note 10, *infra.* Although we do not have the necessary understanding of the industrial framework to decide the question finally, it seems likely that the Company was on notice of the potential liability for back pay at least for those grievances. At the trial, the

We conclude from our examination of the kinds of issues that a laches defense raises that laches is not an appropriate defense in a case such as this seeking to compel arbitration. Accordingly, we remand this case to the District Court with instructions to order arbitration of all the grievances pressed on appeal without limiting the representative grievances to the individual employee submitting them.[20]

Affirmed in part; reversed in part; and remanded with instructions.

## APPENDIX

### ARTICLE 14—SENIORITY

\* \* \* \* \* \*

Section 3—Job Allocation

(a) Whenever a job vacancy arises in a given department, notice thereof shall be posted and maintained on that department bulletin board for a period of three (3) work days. During this three (3) day period the Company may fill the vacancy with any available employee.

(b) Whenever a temporary job vacancy arises in a given department as a result of an employee on leave of absence for 60 days or more, notice thereof shall be posted and maintained on that department bulletin board for a period of three (3) work days. During this three (3) day period the Company may fill the vacancy with any available employee.

(c) Any employee within that department who does not work in the post job classification and who desires the job may bid on it by listing his name on the notice of vacancy. The employee so bidding, who has the greatest seniority within the department, and provided the employee has the ability to perform the job, shall be given the job opportunity; provided, however, that employees who have been cut back from the classification involuntarily shall be restored to such job in their order of seniority before vacancies for such jobs are posted.

Because of the nature of the work performed, the above bidding procedures are not applicable to craftsmen in the maintenance department.

(d) If a job vacancy is filled by a transfer from another job group in the same pay classification by virtue of seniority, the vacancy thus created by such transfer must be filled by the promotion of the senior employee who bids on such job from a lower classification.

(e) No employee shall be eligible to bid on a job vacancy in a lower classification.

(f) Where a job vacancy is not filled through the bidding procedure as provided in (c) of this Section, the junior qualified employee will be forced to fill the vacancy.

(g) To enter the adjuster progression group the employee must be a qualified operator of the equipment involved. Training programs will be developed to improve job performance.

(h) Employees absent on a [sic] approved leave of absence shall be entitled to bid on such job vacancies that occur while they are absent. Such bids must be made within three (3) working days following their return to work.

Section 4—Layoffs

All layoffs will be on a department basis. Probationary employees will be laid off first. (Such employee shall receive accumulated credit for prior service in the event of subsequent rehire, within a ninety (90) day period.)

---

Company's Director of Labor Relations testified that the reason that the Greenwale grievance was chosen for arbitration rather than one of the other three grievances then filed was because the Greenwale grievance did not involve back pay.

20. We add here the caveat that any discussion or resolution of factual issues contained in this opinion or in the opinion of the District Court are for the purpose of determining the question of arbitrability only and are not intended to limit in any way the arbitrator's determination of factual issues necessary to resolve the issues before him.

Next the employees within the department will be laid off in the inverse order of their seniority provided the senior employee retained has the necessary qualifications to satisfactorily perform the job in question.

Internal department transfers made necessary by a reduction in force shall be based on seniority, provided the senior employee has the necessary qualifications to satisfactorily perform the job in question.

Section 5—Recall

Recall of laid off employees will be on a departmental basis in the reverse order in which they were laid off. This Article will also apply to employees who were transferred in accordance with Section 2 of this Article, who as a result of layoff were subsequently returned to their former department. Such employees will be recalled, according to their seniority in the department of transfer.

Laid off employees may be considered for openings when they arise in other departments, provided that all laid off employees in such other departments have been recalled, and provided the laid off employees being considered have the necessary qualifications to perform the jobs in question. Such employees will start as new employees in these departments and departmental seniority will date from the time of employment in the new department. Employees who accept such jobs will not lose their seniority unless they refuse recall to their former department.

Employees recalled shall return to work at the time specified by the Company or notify the Company, within twenty-four (24) hours of the time directed to report of their inability to do so. Employees who fail to report as directed, or fail to notify the Company, shall be considered as having resigned. Recall notifications will be made by certified mail, return receipts requested, to the last given address of the employee as it appears on the personnel records.

\* \* \* \* \* \*

ARTICLE 22—GRIEVANCE PROCEDURE

Section 1—Steps in Handling

Should any employee covered by this Agreement believe he or she has been unjustly dealt with, or that the provisions of the Agreement have been violated, the employee shall within five (5) working days of the incident take the following steps, with no loss of pay in resolving the problem.

Step 1. The employee with or without (at the employee's option) his Steward, shall discuss his grievance with his Foreman and/or Department Superintendent, and they shall make every effort to settle it at once or at least within twenty-four (24) hours.

Step 2. If the grievance has not been adjusted in Step 1, it shall then be referred to the President of the Union, or his designated representative, by the Shop Steward, and he shall discuss it with the persons heretofore involved, and if the grievance it [sic] not then adjusted, he will discuss it with the Department Superintendent and/or Foreman where every effort will be made to settle it within twenty-four (24) hours. If the grievance is not adjusted, it shall be reduced to writing on forms provided by the Company, dated, and signed by the aggrieved employee, Steward, Foreman, and Department Supervisor; it will then be presented by the President and Vice President of the Union to the Personnel Manager or his assistant where every effort will be made to settle it within forty-eight (48) hours. The Shop Steward and the aggrieved employee shall be present during the discussion of the grievance at Step 2, or any subsequent step.

Step 3. If the grievance is not adjusted at Step 2, it will be referred by

the President and Vice President of the Union to the Production Manager or his designated representative who shall have up to forty-eight (48) hours in which to make a decision.

Step 4. If the grievance is not adjusted at Step 3, it shall be referred by the President, Vice President, and Recording Secretary of the Union to the Plant Manager or his designated representative who shall have forty-eight (48) hours in which to make a decision. An International Representative of the Union may be present at this step if desired.

Step 5. If the grievance is not adjusted at Step 4, it may be referred by the President and Vice President of the Union and/or the International Representative to the Director of Labor Relations, or his designated representative, at the earliest opportunity.

Step 6. If the grievance involves a disciplinary penalty or a seniority problem in promotions—layoffs—recalls, it may be referred to arbitration as provided in Article 23. If the grievance involves subjects other than those provided for arbitration under Article 23, they may be referred to the Federal Mediation and Conciliation Service within thirty (30) days after failure of the parties to reach an adjustment under Step 5.

Section 2—Grievance Involving Discharge

The right of the Company to discharge employees is recognized, but on request of the Union, the Company will show cause for any specific discharge.

In the event any employee covered by this Agreement is laid off or discharged, and after investigation it is proven that such employee has been unfairly dealt with, such employee shall be restored to service with seniority unimpaired, and paid for all the time lost.

It is understood that a case such as provided for in this paragraph shall be brought to the attention of the Manager of the plant by the Union as promptly as practicable, and certainly within ten (10) days from the date of the [sic] employee was laid off or discharged.

\* \* \* \* \* \*

## ARTICLE 23—ARBITRATION

A grievance which is limited to the subject matter of either:

(a) a disciplinary penalty, including discharge or suspension, imposed on or after the effective date of this Agreement, which is claimed to have been imposed without proper cause and in violation of its provisions; or

(b) an application of the seniority provision of this Agreement in the case of promotions, layoff, and recalls;

and which has not been adjusted after having been processed through Step 5 of the grievance procedure may be submitted to arbitration upon the request of the Union, provided, such request is made within fifteen (15) days after the final decision on such a grievance has been given by the Director of Labor Relations or his superior.

Thereafter, and before taking further steps under this article a majority of the members of the Union present at a regular or called meeting shall vote on the question of proceeding with the arbitration procedure of this Agreement for the particular unsettled grievance.

Within ten (10) working days after the Union membership has voted to request arbitration pursuant to the foregoing the parties shall meet to select a single arbitrator. In the event that the parties are unable to agree upon a single arbitrator, either party may within ten (10) working days thereafter request the American Arbitration Association to submit a panel of names from which an arbitrator may be chosen. In the selection of an arbitrator and the conduct of any arbitration, the Voluntary Labor Arbitration Rules of the American Arbitration Association shall control.

The power and authority of the arbitrator deciding a grievance involving one of the two subject matters set out above shall be strictly limited to determining the meaning and operation of the explicit terms of this Agreement. The arbitrator shall have no authority to add to or subtract from, or in any way alter or modify any of the terms of this Agreement, or to impose on any party hereto a limitation or obligation not explicity [sic] provided for in this Agreement.

The award of an arbitrator so selected upon any grievance subject to arbitration as herein provided shall be final and binding upon all parties to this Agreement, and upon the aggrieved employee or employees.

The expenses of any arbitration proceedings under this section shall be borne equally by the parties hereto.

## ARTICLE 24—STRIKES

The Union agrees not to call or ratify any unauthorized strike. It further agrees that if an unauthorized strike occurs, the Local and the International Union officials will immediately meet with the Company for the purpose of settling such strike by the use of the regular grievance procedure, and the Union will instruct and use its influence to cause employees in such strike to return to work.

A violation on the part of any employee of this article shall be cause for whatever disciplinary action is deemed appropriate by the Company.

The Union agrees that it will not authorize any strike on issues that have been defined as arbitrable under Article 23. However, this article in no way prohibits the Union from calling an authorized strike on issues that are not arbitrable under Article 23 so long as it complies with the provisions of the Federal or State laws.

The Company agrees not to lock out employees for the duration of this Agreement.

\* \* \* \* \* \*

## ARTICLE 27—NON-DIS-CRIMINATION

The parties agree that the principles of the Civil Rights Act of 1964 have been, to the best of their knowledge and abilities in good faith, embodied into the provisions of this Agreement and will be adhered to by both of the parties.