**RACEWAY PARK, INC.; Toledo Maumee Raceways, Inc., Plaintiffs–Appellees,**

v.

**LOCAL 47, SERVICE EMPLOYEES INTERNATIONAL UNION, Defendant–Appellant.**

No. 97–4251.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 6, 1998.

Decided Jan. 25, 1999.

Jack M. Lenavitt (briefed), Joseph A. Battani (argued and briefed), Toledo, OH, for Plaintiffs–Appellees.

Gregory J. Lavelle (argued and briefed), Macedonia, OH, for Defendant–Appellant.

Before: MERRITT and DAUGHTREY, Circuit Judges; WISEMAN, District Judge.*

MERRITT, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. WISEMAN, D.J. (pp. 963–65), delivered a separate dissenting opinion.

## OPINION

MERRITT, Circuit Judge.

■ Defendant–Appellant Service Employees International Union, Local 47 ("Local 47") appeals a decision of the U.S. District Court for the Northern District of Ohio granting summary judgment in favor of Plaintiff–Appellee Raceway Park, Inc. and Toledo Maumee Raceways, Inc. (collectively "Raceway"), holding that a dispute under the parties' collective bargaining agreement was inarbitrable, and denying Defendant's Motion for Summary Judgment, which sought to compel arbitration of the said dispute. This case presents the issue of whether a federal district court may decide that a dispute otherwise appropriate for arbitration under a collective bargaining agreement is inarbitrable because the notice of intent to seek arbitration is untimely, or whether the issue of timeliness is itself an issue of procedural arbitrability which should be submitted to arbitration. *General Drivers, Warehousemen and Helpers, Local Union 89 v. Moog Louisville Warehouse,* 852 F.2d 871, 873 (6th Cir.1988) (reversing judgment of district court which held that timeliness of filing of arbitration request was question to be determined by arbitrator), a decision with which we disagree, requires us to hold that the timeliness of the request for arbitration is not subject to arbitration in this Circuit, and despite strong misgivings, we affirm the judgment of the district court.

■ In *Moog,* this Court held that "the question of arbitrability—whether a collective bargaining agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination." 852 F.2d at 873. While this

panel is bound by our Court's holding in *Moog,* and must therefore affirm the judgment of the district court in the instant matter, a close inspection of this Court's precedent compels us to conclude (1) that *Moog* represents a grave departure from Supreme Court doctrine mandating that issues of procedural arbitrability be determined by arbitrators, not judges, *see John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); and (2) that *Moog* should be reconsidered, along with this opinion itself, by a full *en banc* panel of this Court.

## I. BACKGROUND

Raceway operates Raceway Park in Toledo, Ohio, which hosts actual on-site horse races, otherwise known as either "live races" or "races on the track." Parimutuel wagering is conducted on both "live races" at the Park and on horse races run at other race tracks nationwide which are televised (simulcast) at Raceway Park. Until the end of 1995, the State of Ohio, with some limited exceptions, had permitted parimutuel betting only on horse races conducted within the State of Ohio. In September 1996, however, the Ohio Legislature passed a bill permitting racetracks in Ohio, such as Raceway Park, to accept parimutuel wagering on horse races conducted nationwide. The format for such wagering, known as "Full Card Simulcasting," allows race tracks within the State of Ohio to increase their revenue substantially by allowing wagering on some of the top horse races around the country.

Patrons at Raceway Park purchase and cash in wagering tickets issued from machines operated by employees of the track known as mutuel clerks. At all times pertinent to this action, Local 47 was the bargaining representative for Plaintiff's employees. On February 10, 1994, Raceway and Local 47 entered into a collective bargaining agreement. During the negotiations for the collective bargaining agreement, which is effective until December 31, 1998, Raceway agreed to

---

\* The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of    Tennessee, sitting by designation.

pay mutuel clerks a base rate salary of thirty-five dollars and fifty cents ($35.50) per day based on ten races per day. For every race beyond ten in a day, Raceway agreed that mutuel clerks were to be paid one additional bonus dollar for each additional "live" race "on the track." As Schedule A to the collective bargaining agreement makes clear: "One Dollar ($1.00) shall be added to the base rate for each live race thereafter on any one daily card." In addition, on February 10, 1994, the parties also signed a Letter of Understanding, which provided, in pertinent part: "It is further agreed that for purposes of the 1994 Contract, any televised race received by Raceway Park at 5700 Telegraph Rd. with parimutuel betting shall be counted as a race on the track for purposes of determining base rate."

The Ohio Legislature's decision in September 1996 to allow parimutuel betting on horse races run nationwide and televised in Ohio caused the current rift between the parties with respect to the wages paid to Local 47 members working at Raceway Park. It is not difficult to see why. After the law was changed, Raceway Park could take bets on well over one hundred races per night, the overwhelming majority of which were national races simulcast at the track for the mere purpose of taking wagers. Although Local 47 members working as mutuel clerks must now process bets on a significantly greater number of races, the Letter of Understanding signed by both parties states that such races are only to be counted as "live races" or "races on the track" for the purpose of determining base rate pay. That is, Local 47 employees do not receive the additional $1.00 per race bonus for ever race beyond the first ten races of the evening, even though they have to process bets on those races.

As a result of this new law, officials of both Raceway and Local 47 met on September 18, September 20, and October 9, 1996 to discuss the full effect that Full Card Simulcasting would have on wages paid to Local 47 employees. Raceway realized that a change in the collective bargaining agreement was necessary due to the fact that it was not compensating employees for the additional televised races that Full Card Simulcasting brought to the track. At the September 20, 1996 meeting, Local 47 produced a written grievance concerning the effect that Full Card Simulcasting has on wages. This grievance was presented to Raceway due to Local 47's apparent concern that the language of the collective bargaining agreement required a grievance to be filed within 48 hours after it arose. On two occasions, Raceway agreed to extend the 48-hour deadline, first to September 19 and then to October 20, 1996.

On October 9, 1996, both parties met face-to-face for the last time to discuss Full Card Simulcasting and its effect on wages. This meeting proved futile. On October 17, 1996, Local 47 again presented its written grievance to Raceway's general manager, seeking to enforce the terms of the collective bargaining agreement as written. The grievance was not resolved. Article V of the parties' collective bargaining agreement governs their official grievance procedures. It provides:

ARTICLE V. GRIEVANCE AND ARBITRATION PROCEDURE

5.1. If there are any grievances by an employee or any differences or dispute of any kind or character between the Employer and the Union, involving the interpretation or application of the provisions of this Agreement and/or any work rules promulgated by the Employer, such grievance, difference or dispute shall be handled in the following manner:

(A). The aggrieved employee and/or a representative of the Union shall, within forty eight (48) hours after the grievance has arisen, or after the employee became aware of such grievance, discuss the matter with the Mutuel Manager or his designated representative.

(B). If no agreement is reached within twenty four (24) hours after such discussion, the matter shall be referred in writing to the General Manager of the Employer and shall be discussed by him or her and/or his or her designated representative and the aggrieved employee and/or his or her Union representative within twenty four (24) hours.

(C). If the dispute is not then resolved the Union may submit the dispute to its

Executive Committee of the bargaining unit who at its next regular meeting, shall determine whether or not to submit the matter to binding arbitration. Unless the Union serves written notice via Certified Mail on the Employer within thirty (30) days after the completion of the meeting referred to in Paragraph (B), above, of its intent to seek binding arbitration, then in such event, all parties shall be barred from ever submitting such grievance, dispute or disagreement to arbitration. Such written notice shall set forth all issues to be considered. Three local attorneys will be picked for the purpose of arbitration. One by the Employer, one by the Union, and a third impartial attorney.

The decision and award of the arbitration shall be final and binding on all parties. The authority of the arbitrators shall be limited to the interpretation and application of the terms and provisions of the Agreement. They shall have no right, power or authority to amend, change or modify this Agreement. Their expenses shall be borne equally by the parties.

*See* Agreement By and Between Raceway & Local 47 at 3, J.A. 13. On November 20, 1996, Local 47 notified Raceway of its desire to proceed to arbitration for an interpretation of the express provisions of the collective bargaining agreement related to the base rate of pay. Raceway refused to proceed to arbitration on the grounds that Local 47 had exceed the time limit established by the collective bargaining agreement for notifying Raceway of its desire to proceed to arbitration.

On December 16, 1996, Raceway filed a declaratory judgment action in the U.S. District Court for the Northern District of Ohio, seeking a declaration that "issues of wages per hour in their agreement with [Local 47] are not subject to arbitration and are binding on plaintiffs and defendants until the agreement expires on December 31, 1998." Compl. ¶ 9. The district court had federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the Labor Management Relations Act, 29 U.S.C. § 185.[1] Nowhere in the Complaint did Raceway allege that Local 47's grievance was procedurally defective. Local 47 answered the Complaint and filed a Counterclaim to compel Raceway to arbitrate the grievance concerning its alleged violation of Schedule A and the Letter of Understanding to the collective bargaining agreement. Raceway filed an Answer to the Counterclaim. Both parties then filed Motions for Summary Judgment. On September 22, 1997, the district court granted Raceway's Motion for Summary Judgment and denied Local 47's motion.

The district court's limited analysis focused on the timing of Local 47's arbitration demand. The court stated:

> In this case, the Union made its arbitration demand on November 20, 1996, thirty-four days after filing its grievance, and forty-two days after the final meeting between the Union and the Racetrack. The Union does not deny in any of its pleadings that its arbitration demand was untimely. Since the Union failed to demand binding arbitration within thirty days after meeting with the Racetrack, it is forever barred from demanding arbitration by the terms of the CBA.

Memorandum Op. at 4 (Sept. 22, 1997).

## II. THE *Steelworkers Trilogy* AND ITS PROGENY

In three cases decided in 1960 and known collectively as the "Steelworkers Trilogy," the Supreme Court strongly endorsed the use of arbitration as a mechanism for resolving industrial disputes arising under collective bargaining agreements. *See United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steel-*

1. Section 301(a) of the Labor Management Relations Act of 1947 provides:
   Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
   29 U.S.C. § 185(a).

*workers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). Predicated, to a large extent, on its fear of labor unrest, *see Warrior & Gulf*, 363 U.S. at 578, 80 S.Ct. 1347 (noting that alternative to arbitrating claims arising out of collective bargaining agreements was "industrial strife"), the Court relied on section 301 of the Labor Management Relations Act to hold that the function of a court with regard to arbitration is limited to (1) assuring that the claim is governed by the contract, *see American Mfg.*, 363 U.S. at 567–68, 80 S.Ct. 1343; (2) ordering parties to arbitration unless the arbitration clause "is not susceptible of an interpretation that covers the asserted dispute," *Warrior & Gulf*, 363 U.S. at 582–83, 80 S.Ct. 1347; and (3) refraining from reviewing the merits of an award so long as it "draws its essence from the collective bargaining agreement," *Enterprise Wheel*, 363 U.S. at 597, 80 S.Ct. 1358.

Prior to 1960, states courts hesitated to enforce grievance arbitration provisions. Even where state courts were willing to enforce collective bargaining agreements, they often did so reluctantly. For example, in *International Association of Machinists v. Cutler–Hammer*, 271 A.D. 917, 67 N.Y.S.2d 317 (N.Y.) (per curiam), *aff'd*, 297 N.Y. 519, 74 N.E.2d 464 (N.Y.1947) (per curiam), a case expressly repudiated by the Steelworkers Trilogy, *see American Mfg.*, 363 U.S. at 566–67, 80 S.Ct. 1343 (citing *Cutler–Hammer* as having "announced a principle that could only have a crippling effect on grievance arbitration"), the state court held that a judge must initially review the pertinent contractual language and determine whether the parties had actually intended their arbitration clause to cover the existing controversy. Moreover, if a court concluded that the grieving party could not prevail on the merits of the dispute, it should abstain from ordering arbitration. The state court stated: "If the meaning of the provision of the contract sought to be arbitrated is beyond dispute,

there cannot be anything to arbitrate and the contract cannot be said to provide for arbitration." *Cutler–Hammer*, 67 N.Y.S.2d at 318.

In a series of five decisions beginning with two of the three Trilogy cases, however, the Supreme Court deliberately molded the proper scope of pre-arbitration judicial intervention. *See United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987); *AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); *Warrior & Gulf*, 363 U.S. 574, 80 S.Ct. 1347 (1960); *American Mfg.*, 363 U.S. 564, 80 S.Ct. 1343 (1960).[2]

*United Steelworkers of America v. American Manufacturing Co.* involved a suit by a union to compel arbitration of a grievance which the union, acting on behalf of one of its members, had filed with that member's employer. The employee in question left his employ due to an injury and then brought an action for compensation benefits. Two weeks after the case settled, the union filed a grievance, claiming that the employee was entitled to return to his job by virtue of a seniority provision in the union's collective bargaining agreement with the American Manufacturing Company. When the Respondent refused to arbitrate, the union brought suit in the U.S. District Court for the Eastern District of Tennessee. The district court held that the employee, having accepted the settlement on the basis of a permanent partial disability, was estopped from claiming any seniority or employment rights. Accordingly, it granted the company's Motion for Summary Judgment. This Court affirmed for other reasons. In reversing the court of appeals, the Supreme Court mapped out a circumscribed role for the judiciary in matters where the concerned parties have negotiated collective bargaining agreements to define their rights. Justice Douglas, writing for a unanimous 8–0 Court,[3] stat-

---

**2.** The third case in the Steelworkers Trilogy, *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), addressed the question of what role courts should take in the post-arbitration review of a labor arbitrator's award.

**3.** Justice Black took no part in the consideration or decision of the case.

ed: "The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." 363 U.S. at 567–68, 80 S.Ct. 1343. The Court also made clear that an individual court's assessment of the merits is neither here nor there in the pre-arbitration phase:

> Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for. The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious.

*Id.* at 568, 80 S.Ct. 1343. In *American Manufacturing,* the union claimed that the company had violated the terms of the seniority provision of the collective bargaining agreement. The company, meanwhile, maintained that it had not violated that clause. The Court thus concluded that because there was a dispute between the parties as to "the meaning, interpretation and application" of the collective bargaining agreement, arbitration should have been ordered. *Id.* at 569, 80 S.Ct. 1343. "When the judiciary undertakes to determine the merits of a grievance under the guise of interpreting the grievance procedure of collective bargaining agreements, it usurps a function which under that regime is entrusted to the arbitration tribunal." *Id.*

In the companion case of *United Steelworkers v. Warrior & Gulf Navigation Co.,* the Court reiterated its admonition that judges should have a limited role in confronting arbitrability issues. Respondent Warrior & Gulf Navigation Company transported steel and steel products by barge from a hub in Chikasaw, Alabama, where it performed routine maintenance and repair work on its own barges. The employees at that hub were covered by a collective bargaining agreement negotiated by the United Steelworkers. Between 1956 and 1958, Respondent reduced its work-force considerably and began contracting out maintenance work previously done by its own employees. Many of the laid-off workers were actually hired, at lower wages, by the companies to which Respondent had contracted its work. A number of Respondent's employees signed a grievance, alleging that the company had violated various provisions of its collective bargaining agreement, which provided for arbitration in the event the parties could not settle their own disputes. In this case, settlement of the grievance was not had and Respondent refused arbitration. The union thus brought suit to compel it. The district court granted the company's Motion to Dismiss the complaint, holding that the agreement did not confide in an arbitrator the right to review the defendant's business judgment in contracting out work, which is strictly a function of management. This Court affirmed on similar grounds.

The Supreme Court first noted that the federal policy of encouraging the inclusion of a provision for arbitration of grievances in collective bargaining is meant to "promote industrial stabilization," 363 U.S. at 578, 80 S.Ct. 1347, "achiev[e] industrial peace," *id.* and "substitute for industrial strife," *id.* Grievance arbitration, "the very heart of the system of industrial self-government," *id.* at 581, 80 S.Ct. 1347, "is part and parcel of the collective bargaining process itself," *id.* at 578, 80 S.Ct. 1347. The *Warrior & Gulf* Court thus found that the role of judges confronting arbitrability issues should be very limited in scope. Emphasizing the "congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration," *id.* at 582, 80 S.Ct. 1347, the Supreme Court delineated an extremely narrow function for courts asked to determine pre-arbitration questions concerning arbitral jurisdiction:

> [T]he judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance.... An order to arbitrate

the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.... In the absence of any express provisions excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail....

*Id.* at 582–83, 584–85, 80 S.Ct. 1347.

The twin products of the Supreme Court's decisions in *American Manufacturing* and *Warrior & Gulf*—a virtually irrebuttable presumption of arbitrability and a sharply limited role for the courts—has had a salutary effect upon grievance arbitration. In a 1990 study of all reported federal district court cases from 1960 until the end of 1988 pertaining to litigation brought to compel grievance arbitration, only 143 district court decisions involved pre-arbitration judicial intervention. Of the 136 decisions which actually resolved the arbitrability question, 103(76%) resulted in a judicial order compelling arbitration. Over the course of 28 years, only 33 district court decisions declined to direct grievance arbitration. *See* Charles B. Craver, *Labor Arbitration as a Continuation of the Collective Bargaining Process*, 66 CHI. KENT L.REV. 571, 581 (1990) (citing Peter Feuille & Michael LeRoy, *Grievance Arbitration Appeals in the Federal Courts: Facts and Figures*, 45 ARB. J. 35, 39 (Mar.1990)). "When one recognizes that thousands of contractual disputes were taken to arbitration during those twenty-eight years, it becomes apparent that the Supreme Court approach has encouraged parties to conclude their bargaining process with respect to contract disputes in the arbitral forum, instead of through resort to judicial intervention." *Id.* at 581–82, 80 S.Ct. 1347.

Several years after the *American Manufacturing* and *Warrior & Gulf* cases, the Supreme Court shed light on a crucial distinction between substantive and procedural arbitrability challenges. In *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), the Court limited the *American Manufacturing/Warrior & Gulf* evaluative criteria to substantive arbitrability questions. In that case, a union entered into a collective bargaining agreement with Interscience Publishers, Inc., a publishing firm. The agreement did not contain an express provision making it binding on successors of Interscience. Several months before the agreement was to expire, Interscience merged with John Wiley & Sons, Inc., another publishing firm, and ceased to do business as a separate entity. At the time of the merger Interscience had approximately 80 employees, of whom 40 were represented by the union. In discussions before and after the merger, the union and Interscience (later John Wiley & Sons) were unable to agree on the effect of the merger on the collective bargaining agreement and on the rights under it of those covered employees hired by John Wiley & Sons. The petitioner asserted that the merger terminated the collective bargaining agreement for all purposes; it thus refused to recognize the union as the employees' bargaining agent or to accede to the union's claim on their behalf. With no solution in sight, the union brought suit in federal district court to compel arbitration.

John Wiley & Sons objected to arbitration on a number of different grounds. Most pertinent to the present case was its final objection, which raised the question of so-called "procedural arbitrability." The collective bargaining agreement provided for arbitration as the third stage of the grievance procedure. John Wiley & Sons argued that because Steps One and Two had not been followed, and since the duty to arbitrate arose only in Step Three, it had no duty to arbitrate the dispute. Moreover, it alleged that the union allegedly had failed to comply with the following provision of the agreement: "Notice of any grievance must be filed with the Employer and with the Union Shop Steward within four (4) weeks after its occurrence or latest existence. The failure by either party to file the grievance within this time limitation shall be construed and be deemed to be an abandonment of the grievance." *See id.* at 556 n. 11, 84 S.Ct. 909. The company maintained that the very question of whether the "procedural" conditions to arbitrate had been met must be decided by a

court and not the arbitrator. The Supreme Court disagreed. The Court recognized that procedural arbitrability claims frequently raise equitable issues that are particularly suited to arbitral determination, and that are often inextricably intertwined with the merits of the underlying contractual dispute: "[L]abor disputes of the kind involved here cannot be broken down so easily into their 'substantive' and 'procedural' aspects. Questions concerning the procedural prerequisites to arbitration do not arise in a vacuum; they develop in the context of an actual dispute about the rights of the parties to the contract or those covered by it." *Id.* at 556–57, 84 S.Ct. 909. The Court thus decided that such procedural matters should be left to arbitral resolution:

> Doubt whether grievance procedures or some part of them apply to a particular dispute, whether such procedures have been followed or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate cannot ordinarily be answered without consideration of the merits of the dispute which is presented for arbitration.... It would be a curious rule which required that intertwined issues of "substance" and "procedure" growing out of a single dispute and raising the same questions on the same facts had to be carved up between two different forums, one deciding after the other.... Once it is determined, as we have, that the parties are obligated to submit the subject matter of a dispute to arbitration, "procedural" questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator.

*Id.* at 557–58, 84 S.Ct. 909. This Court has applied the Supreme Court's reasoning on numerous occasions. *See Chambers v. Beaunit Corp.,* 404 F.2d 128 (6th Cir.1968); *American Radiator & Standard Sanitary Corp. v. Local 7 of the Int'l Brotherhood of Operative Potters, AFL–CIO,* 358 F.2d 455, 458 (6th Cir.1966); *Local No. 824, United Brotherhood of Carpenters and Joiners of Am. v. Brunswick Corp.,* 342 F.2d 792, 793 (6th Cir.1965); *R.F. Rhine v. Union Carbide Corp.,* 343 F.2d 12, 16 (6th Cir.1965); *Avco Corp., Electronics and Ordnance Div. v. Mitchell,* 336 F.2d 289, 291 (6th Cir.1964);

*Western Automatic Machine Screw Co., Div. of Standard Screw Co. v. International Union, United Automobile, Aircraft and Agricultural Implement Workers of Am.,* 335 F.2d 103, 105 (6th Cir.1964).

In *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986), a case relied upon heavily by Plaintiff–Appellee Raceway in the instant matter, the Supreme Court expressly reaffirmed the principles set forth in *American Manufacturing* and *Warrior Gulf. See id.* at 648–50, 106 S.Ct. 1415. Nonetheless, the Court set forth a more intrusive vision for courts confronting arbitrability challenges. Petitioner AT & T and respondent, the union, were parties to a collective bargaining agreement covering telephone equipment installation workers. Article 8 of the collective bargaining agreement established that differences arising with respect to the interpretation of the agreement or the performance of any obligation thereunder had to be referred to a mutually agreeable arbitrator upon the written demand of either party. Article 9 provided that subject to the limitations contained in the provisions of the agreement, but otherwise not subject to the provisions of the arbitration clause, AT & T was free to exercise certain management functions, including the hiring and placement of employees and the termination of employment. Article 20 prescribed the order in which employees were to be laid off. The union filed a grievance challenging AT & T's decision to lay off 79 workers from its Chicago base location, claiming that the layoffs violated Article 20 of the collective bargaining agreement. AT & T, on the other hand, refused to submit the grievance to arbitration on the ground that under Article 9, its decision to lay off workers when it determined there was a lack of work at a facility was inarbitrable. The union then sought to compel arbitration by filing suit in federal district court.

Relying on a contract-based view of the duty to arbitrate, the Court found that a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty. The Court stated:

The willingness of parties to enter into agreements that provide for arbitration of specified duties would be drastically reduced ... if a labor arbitrator had the power to determine his own jurisdiction.... Were this the applicable rule, an arbitrator would not be constrained to resolve only those disputes that the parties have agreed in advance to settle by arbitration, but, instead, would be empowered "to impose obligations outside the contract limited only by his understanding and conscience." This result undercuts the long-standing federal policy of promoting industrial harmony through the use of collective bargaining agreements, and is antithetical to the function of a collective bargaining agreement as setting out the rights and duties of the parties....

See *id.* at 651, 106 S.Ct. 1415. Hence, it was left to the judiciary to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning layoffs predicated on a "lack of work" determination by the company under Article 9 of the collective bargaining agreement. The Court concluded:

If the court determines that the agreement so provides, then it is for the arbitrator to determine the relative merits of the parties' substantive interpretations of the agreement. It was for the court, not the arbitrator, to decide in the first instance whether the dispute was to be resolved through arbitration.

See *id.* A careful reading of *AT & T Technologies* illustrates that the Supreme Court has not weakened its steadfast commitment to arbitration in labor disputes. It is crucial to note, however, that *AT & T Technologies,* unlike *John Wiley & Sons,* was not a case about procedural arbitrability. Rather, the crux of the case was whether the parties intended for disputes involving the layoff provision to go to arbitration. Whether disputes over layoffs should be arbitrated is clearly a matter of substantive arbitrability of the very sort which the Steelworkers Trilogy requires the courts to determine. However, *AT & T Technologies* in no way whatsoever alters the import of the Supreme Court's prior decision in *John Wiley & Sons.*

## III. *Moog's* MISFORTUNE

Federal courts of appeals continue to acknowledge that procedural arbitrability questions are to be determined by arbitrators, not judges. Such procedural issues involve equitable considerations that are optimally left to arbitral determination. By contrast, this Court's own opinion in *General Drivers, Warehousemen and Helpers, Local Union 89 v. Moog Louisville Warehouse,* 852 F.2d 871 (6th Cir.1988), contradicts the growing corpus of federal precedent favoring arbitration of procedural issues. In *Moog,* the parties entered into an arbitration agreement providing that claims were not arbitrable unless the union notified the company of its intention to arbitrate within 15 days of the company's denial of a grievance. The relevant provision of the agreement provided:

Section 1—Any disputes, complaints or grievances arising from alleged violations of this Agreement by the Company shall be settled and determined through the following procedure.

. . . . .

Step (c)—If the grievance is not ... satisfactorily settled and if the grievance is otherwise arbitrable under this Agreement, it may be referred to arbitration in strict accordance with the provisions of this Agreement pertaining to arbitration, but not otherwise, provided, however, that if the Union fails to notify the Company in writing by registered or certified United States mail within 15 calendar days after the Company gives its answer in writing to a grievance ... then the Union shall be conclusively presumed to have accepted the Company's answer thereto and said grievance shall not thereafter be arbitrable.

See *id.* at 872. Defendant Moog Louisville Warehouse, Inc. ("Moog") discharged a member of the plaintiff union who protested his discharge through the procedurally defined grievance steps up to the final stage or arbitration. Moog refused the demand for arbitration, contending that the request made was untimely and therefore rendered the grievance not arbitrable. The union thus brought suit to compel Moog to arbitrate.

The district court held that the timeliness of filing the arbitration request was itself a question to be determined by an arbitrator, and granted the union judgment on the pleadings. This Court reversed, concluding that it was error to compel arbitration. In so doing, this Court clearly ignored the admonition of *John Wiley & Sons* to have such procedural questions decided by an arbitrator.

The *Moog* Court relied on *AT & T Technologies* for the proposition that " 'the question of arbitrability—whether a collective bargaining agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination.' " *Id.* at 873 (quoting *AT & T Technologies*, 475 U.S. at 649, 106 S.Ct. 1415). This Court thus concluded:

> It seems clear ... and without any reasonable doubt, that the arbitration section of the agreement between these parties excludes a grievance about which the union has failed to give notice, as required by Step (c), of a request for arbitration within 15 days after the company has given its answer to a grievance brought by the union. Moog, under [*AT & T Technologies*], cannot be required to submit to an arbitrator for decision a matter expressly and with positive assurance excluded from arbitration.

*Id.* at 874 (footnote omitted).

It is instructive to compare the precise terms of the collective bargaining agreement in *Moog* with those reviewed by the Supreme Court in *John Wiley & Sons*. Section 1, Step (c) of the agreement between Moog and Local Union 89 provided, in pertinent part: "[I]f the Union fails to notify the Company in writing by registered or certified United States mail within 15 calendar days after the Company gives its answer in writing to a grievance ... then the Union shall be conclusively presumed to have accepted the Company's answer thereto and *said grievance shall not thereafter be arbitrable.*" *Id.* at 872 (emphasis added). Similarly, in *John Wiley & Sons*, the agreement between the union and Interscience Publishers, Inc. (later John Wiley & Sons), provided: "Notice of any grievance must be filed with the Employer and with the Union Shop Steward within four (4) weeks after its occurrence or latest existence. The failure by either party to file the grievance within this time limitation shall be construed and be deemed *an abandonment of the grievance*" constituting a bar to arbitration. 376 U.S. at 556 n. 11, 84 S.Ct. 909 (emphasis added).

We find that there is no rational basis on which to distinguish between those issues which the Supreme Court in *John Wiley & Sons* deemed to be procedural, and thus reserved for the arbitrator, and the issue considered by this Court in both *Moog* and the present matter. The notice requirements, with their stated time limits, are substantially similar in wording and import; i.e., in *John Wiley & Sons* the provision provides that in the event that the procedure is not followed, the grievance is deemed "abandon[ed]," *id.*, and in *Moog*, the provision provides that the failure to follow the procedure constitutes a bar to arbitration, *see* 852 F.2d at 872. Although there will undoubtedly be cases where the line between "substantive" arbitrability and "procedural" arbitrability will be very fine, we find that the issue in *Moog*, like the issue in *John Wiley & Sons* and in the instant matter, clearly falls within the latter classification. Given the *Moog* Court's misplaced reliance on *AT & T Technologies*, a case fundamentally about substantive arbitrability which cannot reasonably be read to undermine the edict of *John Wiley & Sons* with respect to matters of procedural arbitrability identical to those confronted by *Moog*, it is difficult, if not impossible, to understand how the *Moog* Court distinguished *John Wiley & Sons*. It could not, and in fact it did not.

The First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and D.C. Circuits have applied *John Wiley & Sons'* sensible conclusion that the issue of whether a union's alleged failure timely to satisfy the notice requirement of its intent to arbitrate is one of procedural arbitrability. *See Great W. Mortgage Corp. v. Peacock*, 110 F.3d 222 (3d Cir.1997); *Smith Barney Shearson Inc. v. Boone*, 47 F.3d 750 (5th Cir.1995); *Automotive, Petroleum and Allied Indus. Employees Union, Local No. 618 v.*

*Town and Country Ford, Inc.*, 709 F.2d 509 (8th Cir.1983); *Hospital & Institutional Workers Local 250 v. Marshal Hale Mem. Hosp.*, 647 F.2d 38, 40–41 (9th Cir.1981); *Delta Air Lines, Inc. v. C.A.B.*, 574 F.2d 546, 550 (D.C.Cir.1978); *Tobacco Workers Int'l Local 317 v. Lorillard Corp.*, 448 F.2d 949, 953 (4th Cir.1971); *International Union, United Automobile, Aerospace and Agriculture Implement Workers v. Folding Carrier Corp.*, 422 F.2d 47, 49 (10th Cir.1970); *Chambers v. Beaunit Corp.*, 404 F.2d 128, 131 (6th Cir.1968); *Palestine Tel. Co. v. Local 1506 of Int'l Brotherhood of Electrical Workers*, 379 F.2d 234 (5th Cir.1967); *Local 51 Int'l Brotherhood of Electrical Workers v. Illinois Power Co.*, 357 F.2d 916 (7th Cir. 1966); *Rochester Tel. Corp. v. Communication Workers*, 340 F.2d 237 (2d Cir.1965); *Trailways v. Amalgamated Ass'n of Street, Elec. Ry. & Coach Employees Div. 1318*, 343 F.2d 815, 818 (1st Cir.1965). It is also not inconsequential that since *Moog* was decided in 1988, this Court on numerous occasions has cited *John Wiley & Sons* approvingly for the principle that matters of procedural arbitrability are to be decided by an arbitrator, not a court. *See Interstate Brands Corp., Butternut Bread Div. v. Chauffeurs, Teamsters, Warehousemen and Helpers Local Union No. 135*, 909 F.2d 885, 889 (6th Cir.1990); *United Indus. Workers, Serv., Transp., Prof. and Gov't of N. Am., Atlantic, Gulf Lakes and Inland Waters Dist. v. United Food and Comm. Workers, Dist. Union Local 1059*, 900 F.2d 944, 947 (6th Cir.1990); *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1355 (6th Cir.1989).

■■ Under the Supreme Court's seminal decision in *John Wiley & Sons*, the issue of whether a union's alleged failure to satisfy the notice requirement barred arbitration is one of procedural arbitrability. This issue is reserved for the arbitrator, and not the district court. Under *John Wiley & Sons*, the district court's role is limited to the determination of whether the parties are obligated to submit the "subject matter" of a dispute to arbitration. The "subject matter" of the dispute in this case is wages or, more precisely, the effect of Full Card Simulcasting on Raceway's calculation of its unionized employees' base rate pay. Interpretation of a collective bargaining agreement begins with the explicit language of the agreement. *See UAW v. Yard–Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir.1983). Article IX ("WAGES") and Schedule A of the collective bargaining agreement between Raceway and Local 47 specifically address the subject of wages. Article V ("GRIEVANCE AND ARBITRATION PROCEDURE") provides that "[i]f there are *any* grievances by an employe or *any* differences or disputes of *any* kind or character between the Employer and the Union, involving the interpretation or application of the provisions of this Agreement and/or work rules promulgated by the Employer, such grievance, difference or dispute shall be handled" pursuant to the terms of that Article. Agreement By and Between Raceway & Local 47 at 3, J.A. 13 (emphases added). "Once it is determined ... that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557–58, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

## IV.  CONCLUSION

■ Were this panel free to ignore the prudential limitations which prevent us from reversing an earlier decision of this Court, we would reverse the judgment of the district court and remand for entry of an order directing the parties to submit the grievance to arbitration in accordance with the terms of the collective bargaining agreement. But our rules do not permit us to overrule another panel of this Court. We therefore must affirm the judgment of the district court.

WISEMAN, District Judge, dissenting.

I agree that *General Drivers, Warehousemen and Helpers, Local Union 89 v. Moog Louisville Warehouse*, 852 F.2d 871 (6th Cir. 1988) represents a grave departure from Supreme Court doctrine and that *Moog* should be reconsidered, along with this opinion itself, by a full *en banc* panel of this Court. Nevertheless, I dissent because I believe that

the instant case can be distinguished from *Moog* and, under Supreme Court and Sixth Circuit precedent, the district court should be reversed.

As the majority notes, the parties in the case at bar met on September 18, September 20, and October 9, 1996 to discuss the effect that Full Card Simulcasting would have on wages paid to Local 47 employees. At the September 20, 1996 meeting, Local 47 produced a written grievance. According to Raceway, Local 47 presented the written grievance due to Local 47's "apparent concern" that the language of the collective bargaining agreement required a grievance to be filed within forty-eight hours after it had arisen. (Appellees' Br. at 8.) According to Local 47, Raceway requested that the Union defer filing its grievance. (Appellant's Br. at 9.) On two separate occasions, Raceway extended the filing deadline, first until September 19, 1996 and then to October 20, 1996. The parties' last face-to-face meeting occurred on October 9, 1996. On October 17, 1996, Local 47 presented its written grievance to Raceway's General Manager. Although no grievance meeting was held, Raceway's general manager orally denied the grievance. Local 47 then demanded arbitration on November 20, 1996. Raceway refused to proceed to arbitration, contending that Local 47 did not notify Raceway of its desire to arbitrate in a timely manner.

The collective bargaining agreement in the case at bar provides as follows:

ARTICLE V. GRIEVANCE AND ARBITRATION PROCEDURE

5.1 If there are ... any differences or dispute[s] of any kind or character between the Employer and the Union, involving the interpretation or application of the provisions of this Agreement ... such ... difference or dispute shall be handled in the following manner:

(A) [A] representative of the Union shall, within forty eight (48) hours after the grievance has arisen ... discuss the matter with the Mutuel Manager or his designated representative.

(B) If no agreement is reached with[in] twenty four (24) hours after such discussion, the matter shall be referred in writing to the General Manager of the Employer and shall be discussed by him or her and/or his or her designated representative and the aggrieved employee and/or his or her Union representative within twenty four (24) hours.

(C) ... Unless the Union serves written notice via Certified Mail on the Employer within thirty (30) days after the completion of the meeting referred to in Paragraph (B), above, of its intent to seek binding arbitration, then in such event, all parties shall be barred from ever submitting such grievance, dispute or disagreement to arbitration.

(Agreement By and Between Raceway & Local 47 at 3, J.A. at 13.)

Raceway insists that, under Article V of the collective bargaining agreement, "in order to have been considered timely filed, [Raceway] should have, and did not, request arbitration on or before November 17, 1996." (Appellees' Br. at 9.) Although it is unclear exactly how Raceway arrived at a cut-off date of November 17, Raceway apparently contends that when it gave Local 47 until October 20 to file a grievance, it was simply extending the forty-eight hour period set forth in Article V.1(A). The parties met face-to-face for the last time on October 9 and the dispute was not resolved between October 9 and October 20, the deadline for further action. Therefore, by the time Local 47 filed its grievance on October 17, the Union was, in effect, referring the dispute in writing to Raceway's General Manager as required by Article V.1(B) of the collective bargaining agreement. *Id.* at 8. While Article V.1(B) requires the Union and Raceway to meet within twenty-four hours after a written grievance is filed, Raceway and Local 47 did not meet. Instead, Raceway's general manager orally denied the grievance. Therefore, Raceway arrived at the conclusion that under Articles V.1(B) and (C), Local 47 had one twenty-four hour period plus thirty days from the date its written grievance was filed—or until November 17—to notify Raceway of its desire to proceed to arbitration. Because Local 47 did not notify Raceway of its desire to arbitrate until thirty-four days later on November 20, the Union's notice was

untimely. Therefore, Raceway refused to arbitrate the parties' dispute.

Like Raceway, Local 47 has its own interpretation of the events leading up to Raceway's refusal to arbitrate. Local 47 argues, in essence, that when Raceway gave the Union until October 20 to file its grievance, Raceway was postponing the date upon which the time periods set forth in Article V.1 would begin to run. Thus, when Local 47 filed its grievance on October 17, the grievance had officially "arisen" and, under Article V.1(A), the Union had forty-eight hours—or until October 19—to discuss the dispute with the Mutuel Manager. If an agreement was not reached within twenty-four hours—or by October 20—the Union had another twenty-four hours—or until October 21—to refer the matter in writing to Raceway's general manager and discuss it with him. Article V.1(B). Finally, under Article V.1(C), Local 47 had thirty days from October 21—or until November 20—to notify Raceway of its desire to arbitrate the dispute. Because the Union notified Raceway of its desire to arbitrate by November 20, the Union's notice was timely under the terms of the collective bargaining agreement and the parties should have proceeded to arbitration.

When a collective bargaining agreement contains an arbitration clause, there is a presumption that disputes, including procedural disagreements, should be submitted to arbitration. *See AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). This presumption may be overcome only if " 'it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.' " *Id.* (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)); *General Drivers, Local Union No. 984 v. Malone & Hyde, Inc.*, 23 F.3d 1039, 1043 (6th Cir.), *cert. denied,* 513 U.S. 1057, 115 S.Ct. 665, 130 L.Ed.2d 599 (1994). In the instant case, Raceway's interpretation of Article V.1 is no more or less plausible than Local 47's interpretation of Article V.1. Thus, it cannot be said "with positive assurance" that Article V.1 is not susceptible of Local 47's interpretation. Consequently, I would reverse the district court because the parties' procedural dispute itself should have been submitted to arbitration.

My analysis is not affected by this Court's decision in *General Drivers, Warehousemen and Helpers, Local Union 89 v. Moog Louisville Warehouse*, 852 F.2d 871 (6th Cir.1988). The *Moog* court found that the dispute before it was "expressly and with 'positive assurance' excluded from arbitration." *See id.* at 874. I cannot say with positive assurance that the procedural dispute between Raceway and Local 47 is excluded from arbitration. Indeed, I believe that the procedural disagreement in the instant case is precisely the type of dispute intended for arbitration. Accordingly, I dissent.